# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| **RANDY LEBOEUF** | § | **DOCKET 20-105** |
| | § | |
| **v.** | § | |
| | § | **JUDGE SUSIE MORGAN** |
| **LOREN L. HATLE, CLEAN METAL** | § | |
| **TECHNOLOGIES, LLC, and** | § | |
| **MICROCLEAN METALS, LLC** | § | **MAGISTRATE DANA DOUGLAS** |

## <u>DECLARATION OF LOREN L. HATLE</u>

1.      In or around August 2010, I discovered a method to remove contaminants and other corrosive material from concrete, metal, and other surfaces and protect such surfaces by applying coatings to protect degradation of these surfaces.

2.      I was introduced to Randy LeBoeuf in early 2014 by Rocky Smith, who works for and owns a minority interest in Randy's company, Innovative Surface.

3.      In January 2015, Randy and I, along with another person, met with David Kiesel, a patent attorney, to discuss my discovery and the modifications I made to it over the years. Based on the technology as it then existed, Mr. Kiesel's firm filed a provisional patent application on my behalf on February 5, 2015.  The provisional application was assigned U.S. Serial No. 62/112,530 ("530 provisional application").

4.      On February 27, 2015, Randy formed Clean Metal Technologies, L.L.C. ("CMT") specifically to make use of my technology, as described in the 530 provisional application. Randy was designated as the sole manager and a member of CMT and I, along with Rocky Smith, were listed as members.

5.      In December 2015, I assigned to CMT all of my interest in and rights to the inventions disclosed in the 530 provisional application.  In exchange, I received 49 units of CMT's Class A voting membership interests and 86 units of the non-voting Class B membership

Exhibit A

interests.  Randy owned the other 51 Class A voting units and 69 of the Class B units.  Rocky held the remaining 45 units of the Class B membership interests and had no voting rights.

6.	On February 1, 2016, U.S. patent application Serial No. 15/012,618 ("618 patent application") was filed that claimed priority to the 530 provisional application.

7.	From the beginning of CMT's formation, Rocky and I spent a great deal of time formulating product based on the technology in the 530 provisional application.  We did this out of the garage of Rocky's home in Richmond, Texas and we traveled to multiple places throughout Texas and Louisiana to pitch the product to potential customers.  Despite Rocky and I bringing in several prospects, Randy would never fund any of the projects.  This became a big source of contention between me and Randy.

8.	CMT never got off of the ground.  The company never made a profit, never sold any product, and never had any customers.  A true and correct copy of CMT's income statement as of October 31, 2015 is attached hereto as **Exhibit 1**.

9.	 I first met Clifford Wright in December 2015 when a company that I had an ownership interest in was going through bankruptcy.  Cleve Glenn, who was an attorney with K&L Gates at the time, was one of the lawyers representing my company in the bankruptcy proceeding.  Claims to the technology underlying my original August 2010 discovery were made in that proceeding.  Cliff, who I had never met before and who tried to insert himself into my legal representation, heard about and was privy to details of this technology.  Cliff was (and still is) a managing director with Berkeley Research Group, LLC ("BRG") when I was introduced to him in December 2015.

10.	In early March 2016, I was called out of the blue by Cliff.  A few days later, on March 4, 2016, per Cliff's urging, I engaged BRG to provide consulting services on strategy for

CMT membership and for launching world-wide product sales. Cliff was listed as the person who would lead the consulting services. Cliff assured me that I would not have to pay him or BRG any consulting fees. As part of this consulting relationship, I shared the details of the technology in the 618 patent application with Cliff and provided him with other confidential and proprietary information.

11.     Not long after Cliff called me and convinced me to engage BRG, Randy fired me from CMT in April 2016. Cliff brought in Cleve Glenn, my previous bankruptcy attorney and then an associate with Seyfarth Shaw LLP. I later came to learn that without my knowledge or consent, Cleve contacted Randy and inquired about me purchasing Randy's membership interest in CMT. I had no money and was struggling to cover my personal expenses, which was a well-known fact among all the parties, including Randy.

12.     While this was all going on, Cleve formed MicroClean Metals, LLC for Cliff. MicroClean's certificate of filing with the Texas Secretary of State became effective on May 3, 2016 and lists Cleve as the company's initial registered agent. MicroClean's company agreement listed Cliff as the sole manager and member of the company, as well as its President and CEO. I had no initial ownership interest in MicroClean and was not involved in its formation, but was designated as the company's Chief Technical Officer.

13.     Randy, Cliff, and Cleve knew that I had no money to purchase Randy's membership interest in CMT. Despite this knowledge and unbeknownst to me, Cleve and Cliff worked with Randy's attorney, Sid Sundbery, to structure a deal in such a way that I took all of the risk and saw no reward. It turns out that Randy, Cliff, and Cleve planned to exploit my patent technology for their own financial gain and if their plan did not work, I would be the only one on the hook to the tune of over $1.1 million.

14.     On August 25, 2016, the closing date for the transaction to purchase Randy's membership interest in CMT, I went to Cleve's office at Seyfarth and was presented with a stack of documents to sign that I had never seen or been advised as to their meaning and effect. Multiple times I asked Cliff and Cleve about the $882,000 that one of the agreements seemed to say I would owe Randy for his membership interest and I was constantly told not to worry about it. Cliff and Cleve knew that I did not have the money to pay Randy even a fraction of the $882,000, a fact that I continuously made known while in Cleve's office. But Cliff assured me that he had a lot of experience developing businesses and making them profitable, seeming to imply that he would grow CMT's business to pay Randy off on my behalf. Knowing that I did not understand the details or effects of the agreements or what I was agreeing to be bound by, Cliff and Cleve pressured me to sign the documents.

15.     I was not aware that there were any forum selection or venue provisions in the purchase agreement with Randy or in any of the other documents that I signed in Cleve's office. These provisions, along with others, were never explained to me by Cleve and Cliff. I believe that Randy deliberately put the venue provisions into the agreements because he knew I would default under the agreements because I did not have the money to pay him. Thus, it was not *if* Randy was going to sue me, but *when*. Randy gave Cliff time to see if Cliff could make money off of my patent technology through MicroClean Metals and pay Randy the purchase price he, Cliff, and Cleve came up with for Randy's CMT membership interest. If it did not work out (which it didn't), Randy could always sue me in Terrebonne Parish, where Randy lives and works, to gain control over the technology.

16.     I learned of this scheme among Randy, Cliff, and Cleve after I ran into Randy at a trade show in New Orleans, Louisiana in early April 2017. There, Randy told me that he just

threw out the $882,000 number for his membership interest in CMT and that Cliff recommended to Randy that he charge more—in the $1 million range.  Cliff was trying to show investors that the company was worth more than it really was.

17.     I was so upset by what Randy told me that I wrote a letter to Cliff and Cleve when I got home from the New Orleans trade show.  I let them know what I learned from Randy and expressed my disappointment that they would play such a game with my trust.  A true and correct copy of the April 3, 2017 letter that I sent to Cliff Wright and Cleve Glenn is attached hereto as **Exhibit 2**.

18.     On April 24, 2017, I sent an email to Cliff and Cleve announcing my resignation from MicroClean Metals, which at this time had the exclusive rights to the 618 patent application and the technology described therein.  In a series of email exchanges, Cliff emailed me on April 26, 2017 wherein he told me that "Randy wanted and took your guarantee knowing you could not make the debt whole, he wanted your commitment, Randy knew money had come into MicroClean and it was MicroClean that was actually acquiring his controlling CMT shares."  A true and correct copy of the April 2017 email exchanges between me and Cliff Wright and Cleve Glenn are attached hereto as **Exhibit 3**.

19.     In September or October 2017, I and another person met with Randy at Sid Sundbery's office with the goal of trying to restructure the deal involving my purchase of Randy's CMT membership interest.  I was trying to get some relief by possibly restructuring the promissory notes.  Randy admitted to me at this meeting that he knew I could not pay for his membership interest and that he knew he would never get the money.  Randy said this in front of his attorney, Sid Sundbery.

20.    On July 24, 2018, the 618 patent application was granted as patent number 10030310 (the "310 patent"). As part of the purchase agreement with Randy, this patent is collateral for the money I supposedly owe Randy for his membership interest in CMT and the money that CMT supposedly owes Randy as a loan repayment.

21.    For more than three years since I signed the purchase contract and other documents for Randy's membership interest in CMT, Randy never asked me for payment under the agreements. Even when I saw Randy in person at the New Orleans trade show in early April 2017 and in Sid Sundbery's office in September or October 2017, Randy never demanded the payments that I supposedly owe him.

22.    In early November 2019, I received a letter via certified mail from Darryl Landwehr stating that he represents Randy and demanding payment of the $882,000 plus interest for Randy's membership interest and the $300,000 plus interest owed by CMT. Not coincidentally, around the same time, I received an email from J. Morgan Dixon attaching a letter that instructed me to sign an inventor's declaration for U.S. patent application Serial No. 16/549,725 (the "725 patent application") that CMT allegedly filed listing me as the inventor. Mr. Dixon is an attorney with the same law firm of David Kiesel, who Randy retained to file the 530 provisional application and the 618 patent application on my behalf. The 725 patent application attempts to claim new technology that I invented separate and independent from my time with CMT and has nothing to do with the technology in the 618 patent application that resulted in the 310 patent. I filed a provisional application for my new technology in or around March, 2019. It is my belief that Randy learned of my new provisional patent application and, as a result, retained the Landwehr Law Firm to send me the demand letter and directed Mr. Kiesel's firm to draft the 725 patent application and request that I sign the inventor's declaration. True

and correct copies of the letters from Mr. Landwehr and Mr. Dixon are attached hereto as **Exhibits 4** and **5**, respectively.

23.      After receiving the demand letter from Mr. Landwehr and the 725 patent application letter from Mr. Dixon, I retained counsel to file a lawsuit against Randy, Cliff, and Cleve and their respective companies in state court in Harris County, Texas for the fraudulent scheme committed against me.  At the time of filing this suit, I was not aware of and had not been served with the present lawsuit that Randy filed against me in Terrebonne Parish and subsequently removed to the U.S. District Court for the Eastern District of Louisiana.  A true and correct copy of Plaintiff's Original Petition filed on my behalf in Cause No. 2019-87343, *Loren L. Hatle v. Clifford Wright, Jr., Berkley Research Group, LLC, Cleve J. Glenn, Seyfarth Shaw LLP, MicroClean Metals, LLC, and Randy P. LeBoeuf*, in the 333rd Judicial District Court, Harris County, Texas, is attached hereto as **Exhibit 6**.  The facts and allegations set forth in **Exhibit 6** are true and correct and I am competent to testify to the matters stated therein.

24.      I have never resided in Terrebonne Parish, Louisiana.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on this  11th  day of February, 2020.

_____
Loren L. Hatle

Clean Metal Technologies, LLC
Income Statement
For the Ten Months Ending October 31, 2015

| | | Current Month | | | Year to Date | |
|---|---|---:|---:|---|---:|---:|
| **Revenues** | | | | | | |
| Total Revenues | | 0.00 | 0.00 | | 0.00 | 0.00 |
| | | | | | | |
| **Cost of Sales** | | | | | | |
| Total Cost of Sales | | 0.00 | 0.00 | | 0.00 | 0.00 |
| Gross Profit | | 0.00 | 0.00 | | 0.00 | 0.00 |
| **Expenses** | | | | | | |
| Wages Expense | $ | 10,880.00 | 0.00 | $ | 31,560.00 | 0.00 |
| Payroll Tax Expense | | 838.68 | 0.00 | | 2,841.76 | 0.00 |
| Legal Fees | | 17,230.45 | 0.00 | | 69,339.91 | 0.00 |
| Accounting Fees | | 0.00 | 0.00 | | 5,025.00 | 0.00 |
| Rent or Lease Expense | | 1,700.00 | 0.00 | | 12,801.00 | 0.00 |
| Bank Fees | | 0.00 | 0.00 | | 1,750.00 | 0.00 |
| Maintenance & Repairs Expense | | 0.00 | 0.00 | | 7,497.04 | 0.00 |
| Utilities Expense | | 138.78 | 0.00 | | 609.11 | 0.00 |
| Office Supplies Expense | | 0.00 | 0.00 | | 4,480.87 | 0.00 |
| Telephone Expense | | 181.71 | 0.00 | | 2,949.17 | 0.00 |
| IT Support | | 572.13 | 0.00 | | 4,292.96 | 0.00 |
| Other Office Expense | | 124.12 | 0.00 | | 1,931.63 | 0.00 |
| Advertising Expense | | 133.75 | 0.00 | | 4,764.75 | 0.00 |
| Subcontractors Expense | | 0.00 | 0.00 | | 39,423.50 | 0.00 |
| Fuel Expense | | 0.00 | 0.00 | | 3,207.82 | 0.00 |
| Entertainment Expense | | 0.00 | 0.00 | | 4,849.10 | 0.00 |
| Freight Expense | | 182.08 | 0.00 | | 378.95 | 0.00 |
| Service Charge Expense | | 265.91 | 0.00 | | 853.09 | 0.00 |
| Supplies Expense | | 0.00 | 0.00 | | 11,601.46 | 0.00 |
| UNIFORM EXPENSE | | 0.00 | 0.00 | | 816.09 | 0.00 |
| Travel Expense | | 0.00 | 0.00 | | 7,020.25 | 0.00 |
| Insurance Expense | | 4,682.49 | 0.00 | | 10,864.49 | 0.00 |
| Interest Expense | | 1,078.92 | 0.00 | | 1,078.92 | 0.00 |
| Training Expense | | 0.00 | 0.00 | | 812.43 | 0.00 |
| Taxes and Licenses | | 0.00 | 0.00 | | 375.00 | 0.00 |
| Donations | | 0.00 | 0.00 | | 1,000.00 | 0.00 |
| Depreciation Expense | | 8,835.43 | 0.00 | | 8,835.43 | 0.00 |
| Total Expenses | | 46,844.45 | 0.00 | | 240,959.73 | 0.00 |
| Net Income | $ | (46,844.45) | 0.00 | $ | (240,959.73) | 0.00 |

**EXHIBIT 1**

April 3, 2017

Cliff Wright
MicroClean Metals, LLC
700 Louisiana, Suite 2600
Houston, TX 77002

Cleve Glenn
Seyfarth Shaw LLP
700 Milam St., Suite #1400
Houston, Texas 77002-2812

Dear Cliff & Cleve,

On April 7, 2017, it will be one year with no paycheck; I have no means of income, no method of getting income without the capital resources to even look a prospective opportunity or upon request to visit the opportunity. Cliff, on March the 16th I told you that Dow wanted me to visit a project in Deer Park, I said I didn't have enough money to buy gas to get there, you gave no response, I ask you if you could possibly put some personal money in, you said **"I think that is an inappropriate request",** the conversation ended.

While at the NACE 2017 Conference Randy LeBoeuf stopped by to visit, we had a very cordial and interesting discussion. He wondered why I wasn't involved with the buyout discussions; I told him I wasn't invited and wasn't needed, that I had put my total trust into both of you. It became more interesting when he reaffirmed the discussion of the $800,000.00. This amount was never part of his original scope of the sell of the company when he wanted to sell, he just through that number out and you bit. There were simply no negotiations of the value of the company based on prior sales. He simply stated a price and you agreed. In review and analyzing developments prior to our engagement and what has become very disturbing, is in February and March 2016, I started talking with Del Ulberg and Steve Fournier about developing a business relationship, in the last part of March and April I openly discussed with you Cliff about moving forward with the relationship. With your ambition, you gained my confidence, convincing me to go along with your scheme, I believed you. Little did I know, nor did I ask how the company was going to be capitalized, I ignorantly assumed; you having allegedly developed over 900 businesses and making them profitable would have had the ability to secure funds for company growth. Had I went with Del Ulberg, Steve Fournier, and Rod Johnson I wouldn't be in a position to consider personal bankruptcy?

To recap on a term I have heard in the past and during the development of the Formation Agreement, that '**projects are eminent'**; yes projects were and are eminent but like anything, and I'll use the crop analogy, we've had and have very fertile ground but nothing grows if nothing is planted. In our case we ate the seed corn. Is this a simple enough explanation?

To date I have received a sum total of approximately $5,000.00 from MicroClean as a result of an investor of which was in turn used to pay back existing operating expenses and $2,000.00 as a result of the collection of an invoice funded by Kip Knowles. I have been living on unemployment of which now is exhausted and have used up the last of my Social Security retirement monies. Steve Founier gave me a personal loan last June of $5,000.00 to keep me whole; Kip Knowles gave me $10,000.00 in October to purchase goods for our first purchase order from Coval Molecular. Todd Olson has used his own credit to purchase all products from Moon Chemicals as well as supply all the money to market the MicroClean Metals retail version as well as produce the collateral and video materials at no cost to MicroClean Metals. In addition

EXHIBIT 2



Todd has paid all expenses including mine to the NACE Western Area Conference in San Francisco as well as the recent Seattle Boat Show and currently the NACE 2017 Corrosion Conference with no financial contribution from MCM. Todd's total financial contributions now exceed $130,000.00 with no current return on investment and he now is the only one that has given me any monies at all.

Bruce Jacobsen was our first and only investor for a sum of $125,000.00 and wants to know the re-payment status. The balance of potential investors, 1.) Arael Dolittle 2.) George Walker, 3.) Aziz Jamaluddin, 4.) Gary Bakerink / Majid, 5.) Kip Knowles and 6.) Lino Romo.

After reviewing the formation agreement signed with Randy LeBoeuf, neither Jeff Schuloff, nor his son Bryan is interested in engaging with any financial support. When they reviewed the Membership Interest Purchase Agreement, Exhibit "A", I can see why you didn't want me to see that I was personally responsible for over $1.1 million dollars with no risk to you, not to mention the ongoing accrual of debt to you and BRG.  Your comment to Steve Founier of how you managed to get 10% of the company was **"I unlocked Loren from Randy,"** the reality is, you totally entangled me! Your negotiations have put my family and me at total risk with no risk to anyone else. My most recent interest, Lino Romo refuses to engage under the current management authority.

One following observation and comment; Cleve, you were my personal attorney until August 25th; if you were reviewing the documents as they were being drafted and approved, why wasn't I being informed as to the content and the personal implications to my family and me?

Gentlemen, you may find it rewarding to play a game where you opponent knows nothing about the game or what questions to ask but in this case, I have been misled, manipulated, and betrayed. Under these extreme financial conditions and under your leadership I have no choice but to find financial opportunities elsewhere.

Gentlemen, this past year have become a cruel and intolerable joke!

With kind regards,


Loren

Loren L. Hatle



EXHIBIT 3

1

Begin forwarded message:

**From:** Clifford Wright <CWright@thinkbrg.com>
**Date:** April 28, 2017 at 9:04:39 AM CDT
**To:** Loren Hatle <llhatle@cleanwirx.com>, "llhatle@gmail.com" <llhatle@gmail.com>
**Cc:** "Glenn, Cleve J." <CGlenn@seyfarth.com>
**Subject: RE:  Resignation**


Loren,

As a way of putting things behind us and preparing for cash flow to start coming in, I'd like your agreement on the following:

1. A renewal invoice is on my desk for your auto insurance for $1724.00 due May 7.
2. I am willing to personally put in the money to pay that (and have been personally funding the QuickBooks monthly fees), if:
   a. You, Cleve, and I agree to sign mutual releases (for all matters prior to signing this) by each of us, for each of us and our firms

Let me know your thoughts,
Cliff


**Clifford Wright** | Managing Director | Strategy
Governance Fellow

Berkeley Research Group, LLC
700 Louisiana Street, Suite 2600 | Houston, TX 77002
D 713.481.9446 | M 713.922.0991 | F 832.862.2272
CWright@thinkbrg.com | thinkbrg.com



---

**From:** Clifford Wright
**Sent:** Wednesday, April 26, 2017 9:06 AM
**To:** 'Loren Hatle' <llhatle@gmail.com>
**Subject:** RE: Resignation


Loren,
I was trying to understand what you were trying to accomplish with the resignation as I did not see how it helped you.

I also wanted to follow up as I did not receive an answer from you for the email below if you were interested in a larger equity raise than we really needed – see email below.

I simply do not have any discretion to disperse funds to you or anyone else as there is no funds until a payment from a product sale is received or an equity sale is made. We are not yet credit worthy for receiving debt without a personal guarantee from you and unfortunately your guarantee does not provide any support. Randy wanted and took your guarantee knowing you could not make the debt whole, he wanted your commitment, Randy knew money had come into MicroClean and it was MicroClean that was actually acquiring his controlling CMT shares.

You know that the same terms for debt and equity were given to all sources you and all others suggested that were taken by the third party for the $125,000. These terms came from our legal, Cleve, and were accepted by the debt holder. All parties had the opportunity to counter with their own terms, no one did.
The small amount of money raise has been the real world issue, not just for MCM, but for all start-ups. So we only have 2 choices – wait for sales cash flow or sell a bigger piece that might entice someone as the $250,000 is just too small for anyone that is not already familiar with you and the product.

Interested in selling a larger piece as the email below asks?

Cliff

**From:** Todd Olson [mailto:todd@wirxgroupllc.com]
**Sent:** Thursday, April 6, 2017 10:34 AM
**To:** Clifford Wright <CWright@thinkbrg.com>
**Cc:** Loren Hatle <llhatle@gmail.com>; Rachael Jackson <rachael@ruggedsafety.com>
**Subject:** Re: Equity raise and dilution versus sales cash flow timing

I agree with you on the timing I am working on a business plan with forecasting.

--
Sent from myMail for Android

Wednesday, 05 April 2017, 07:28AM -07:00 from Clifford Wright
CWright@thinkbrg.com:


Team,

I spoke to my partner in the broker/dealer arm of BRG about fundraising small amounts of money for MicroClean at lunch yesterday.

His comments to me below have not changed.

While our need is more like $250,000, investors find it not worth their effort to go forward as the same amount of work is required as would be required to place millions. I asked him if we raised $1 million, would that get over the threshold, he indicated that he has sources who might be interested. I told him I'd see what our appetite was for that. Clearly we could split that amount into debt and equity and thereby reduce dilution of our equity, but it would still be greater than that required to receive $250,000. I think we should pursue that. If the answer is yes, we still have to put a book together and get his committees approval to take this on, even then it is likely our need for cash will not exist any longer due to sales cash flow. Thoughts?


**Clifford Wright** | Managing Director | Strategy

Governance Fellow


Berkeley Research Group, LLC

700 Louisiana Street, Suite 2600 | Houston, TX 77002

D 713.481.9446 | M 713.922.0991 | F 832.862.2272

CWright@thinkbrg.com | thinkbrg.com



---

**BERKELEY RESEARCH GROUP, LLC (TOGETHER WITH ITS AFFILIATES, "BRG") - NOTICE**
THIS EMAIL TRANSMISSION AND ANY ATTACHMENTS HERETO CONTAIN INFORMATION FROM BRG WHICH MAY BE CONFIDENTIAL AND PRIVILEGED. THE INFORMATION IS INTENDED FOR THE SOLE USE OF THE INDIVIDUAL OR ENTITY TO WHOM IT IS ADDRESSED. IF YOU ARE NOT THE INTENDED RECIPIENT, YOUR USE, DISSEMINATION, FORWARDING, PRINTING OR COPYING OF THIS INFORMATION IS PROHIBITED.

**Clifford Wright** | Managing Director | Strategy Governance Fellow

**Berkeley Research Group, LLC**
700 Louisiana Street, Suite 2600 | Houston, TX 77002
D 713.481.9446 | M 713.922.0991 | F 832.862.2272
CWright@thinkbrg.com | thinkbrg.com



---

**From:** Loren Hatle [mailto:llhatle@gmail.com]
**Sent:** Wednesday, April 26, 2017 8:06 AM
**To:** Clifford Wright <CWright@thinkbrg.com>
**Cc:** Loren Hatle <llhatle@gmail.com>
**Subject:** Re: Resignation

Cliff, I understand the whole team is putting their shoulder in to this; my question is per your statement, "Call me anytime after 10 this morning so I can understand your plans and see how we can accommodate". What does how we can accommodate mean?

Loren

Loren Hatle
NACE CIP #207
832-233-4683
llhatle@gmail.com

On Apr 25, 2017, at 8:00 PM, Clifford Wright
<CWright@thinkbrg.com> wrote:

Thanks Loren,
I know the whole team is putting their
shoulder into this to make cash start
flowing ASAP.
Cliff

**Clifford Wright** | Managing Director | Strategy
Governance Fellow

**Berkeley Research Group, LLC**
700 Louisiana Street, Suite 2600 | Houston, TX 77002
D 713.481.9446 | M 713.922.0991 | F 832.862.2272
CWright@thinkbrg.com | thinkbrg.com

<image001.png>

**From:** Loren Hatle [mailto:llhatle@gmail.com]
**Sent:** Tuesday, April 25, 2017 7:50 PM
**To:** Clifford Wright <CWright@thinkbrg.com>
**Cc:** Loren Hatle <llhatle@gmail.com>; Cleve Glenn
<cglenn@seyfarth.com>
**Subject:** Re: Resignation

Cliff,

With reference to your response, "Call me anytime
after 10 this morning so I can understand your plans
and see how we can accommodate". My financial
pressures have been mounting for over a year,
which include no salary and no reimbursements for
expenses, in your comment see how we can
accommodate; my concerns are, 1.) Back pay, 2.)
Monthly salary, 3.)  Reimbursements of on going
and accrued expenses.

I will continue working for MicroClean Metals to
the best of my abilities for the benefit of our
distributors and resolution to our current
difficulties.

With kind regards,

Loren

Loren Hatle

NACE CIP #207
832-233-4683
llhatle@gmail.com


On Apr 24, 2017, at 6:03 AM,
Clifford Wright
<CWright@thinkbrg.com> wrote:

Loren,
Call me anytime after 10 this morning so I
can understand your plans and see how we
can accommodate.

Cliff Wright
Managing Director
713.922.0991

On Apr 24, 2017, at 5:48 AM, Loren Hatle
<llhatle@gmail.com> wrote:

> Cliff and Cleve,
>
> Because of the inordinate
> burden you placed on me,
> my family, my relationship,
> my inability to support my
> family and meet my
> personal obligations,
> effective today I am no
> longer able to work for
> MicroClean Metals, LLC
>
>
> <MCM Letter 4-24-17.pdf>
>
>
>
> Loren Hatle
> NACE CIP #207
> 832-233-4683
> llhatle@gmail.com

BERKELEY RESEARCH GROUP, LLC (TOGETHER WITH
ITS AFFILIATES, "BRG") - NOTICE
THIS EMAIL TRANSMISSION AND ANY ATTACHMENTS
HERETO CONTAIN INFORMATION FROM BRG WHICH
MAY BE CONFIDENTIAL AND PRIVILEGED. THE
INFORMATION IS INTENDED FOR THE SOLE USE OF THE
INDIVIDUAL OR ENTITY TO WHOM IT IS ADDRESSED. IF
YOU ARE NOT THE INTENDED RECIPIENT, YOUR USE,
DISSEMINATION, FORWARDING, PRINTING OR
COPYING OF THIS INFORMATION IS PROHIBITED.



TAX ADVICE DISCLOSURE
ANY TAX ADVICE CONTAINED IN THIS
COMMUNICATION (INCLUDING ANY ATTACHMENTS) IS

NOT INTENDED OR WRITTEN TO BE USED, AND
CANNOT BE USED, FOR THE PURPOSE OF (I) AVOIDING
PENALTIES UNDER THE INTERNAL REVENUE CODE OR
(II) PROMOTING, MARKETING OR RECOMMENDING TO
ANOTHER PARTY ANY TRANSACTION OR MATTER
ADDRESSED HEREIN.

BRG IS (I) NOT A LAW FIRM AND DOES NOT PROVIDE
LEGAL ADVICE AND (II) NOT A CPA FIRM AND DOES
NOT PROVIDE AUDIT, ATTEST OR PUBLIC ACCOUNTING
SERVICES.

# LANDWEHR LAW FIRM
### ATTORNEYS AND COUNSELLORS AT LAW
Suite 835
*935 Gravier Street*
New Orleans, Louisiana 70112

MERRILL T. LANDWEHR
DARRYL T. LANDWEHR

TELEPHONE (504) 561-8086
FACSIMILE (504) 561-8088

October 30, 2019

**CERTIFIED MAIL-RETURN RECEIPT REQUESTED**
Loren L. Hatle
21122 Grandin Wood Ct.
Humble, TX 77338

**CERTIFIED MAIL-RETURN RECEIPT REQUESTED**
Clean Metal Technologies, LLC
c/o Loren L. Hatle
21122 Grandin Wood Ct.
Humble, TX 77338

> Re: **Membership Purchase Interest Agreement by Randy Leboeuf,
> as seller, and Loren Hatle, as buyer, dated August 25, 2016;
> Deferred Purchase Price Consideration Note, dated August 25,
> 2016, in the principal amount of $882,000.00; and
> Deferred Loan Repayment Note, dated August 25, 2016, in
> the principal amount of $300,000.00
> Our File No. 2190**

Dear Ms. Hatle:

This letter is to advise of my representation of Mr. Randy LeBoeuf, the current holder and owner of the following two (2) described Promissory Notes made payable to the order of Randy LeBoeuf, to-wit:

1. Promissory Note (Deferred Purchase Price Consideration Note) made and executed by Loren L. Hatle, dated August 25, 2016, in the principal amount of $882,000.00, plus interest per annum until paid in full at the rate of the Bank Prime Rate as quoted in the Wall Street Journal on each installment due date, all of which is payable as follows:

> (i) A principal payment of $82,000.00, plus accrued interest at the rate of the Bank Prime Rate as quoted in the Wall Street Journal (not to exceed 5% per annum), on November 25, 2016; and

> (ii) Six (6) consecutive quarterly payments of principal in the amount of $133,333.34 each, plus accrued interest at the rate of the Bank Prime Rate as quoted in the Wall Street Journal on each instalment date (not to exceed 5% per annum), commencing on November 25, 2016, and continuing on the same day of each third month thereafter until paid in full.

**EXHIBIT 4**

2. Promissory Note (Deferred Loan Repayment Note) made and executed by Clean Metal Technologies, LLC, dated August 25, 2016, in the principal amount of $300,000.00, conditioned to bear interest per annum until paid in full at the rate of the Bank Prime Rate as quoted in the Wall Street Journal on each installment due date, all of which is repayable in six (6) consecutive quarterly installments of principal in the amount of $50,000.00 each, plus accrued interest at the rate of the Bank Prime Rate as quoted in the Wall Street Journal on each installment date (not to exceed 5% per annum), commencing on November 25, 2016, and continuing on the same date of each third month thereafter until paid in full.

Both of the afore-described Promissory Notes are in default. More specifically, according to my client, no payments have been received by my client as required on either one of these Promissory Notes, leaving outstanding and unpaid the following sums thereon, to-wit:

(i) Promissory Note (Deferred Purchase Price Consideration Note) in the principal amount of $882,000.00, dated August 25, 2016 - a balance of $882,000.00, plus interest thereon at the rate of the Bank Prime Rate as quoted in the Wall Street Journal on November 25, 2016 (i.e., 3.75% per annum), until paid in full, plus all costs and attorney's fees fixed at 25% of the balance due; and

(ii) Promissory Note (Deferred Loan Repayment Note) in the principal amount of $300,000.00, dated August 25, 2016 - a balance of $300,000.00, plus accrued interest thereon at the rate of the Bank Prime Rate as quoted in the Wall Street Journal each installment due date (i.e., 3.75% per annum), commencing November 25, 2016, until paid in full, plus all costs and attorney's fees fixed at 25% of the balance due.

Given the default in payment of the afore-described Promissory Notes, Randy LeBoeuf hereby gives notice to you and Clean Metal Technologies, LLC of the exercising of his right and option to declare formally both Promissory Notes to be in default, to accelerate the maturity thereof, and insist upon immediate payment in full of the unpaid principal balances due thereon, plus accrued interest, together with attorney's fees and costs.

Notice is hereby further given that if the outstanding balances due on the Promissory Notes as set forth hereinabove is not paid within ten (10) days from date of this correspondence, Mr. Randy LeBoeuf, as the holder and owner of the Promissory Notes, will institute legal proceedings to collect the amounts due thereon, plus all attorney's fees, costs and expenses as provided therein.

Unless you notify us in writing within thirty (30) days of receipt of this notice that you dispute the validity of the debt, we will assume that the debt is valid. If you notify us, in writing, within thirty (30) days of receipt of this notice that the debt or any portion thereof is disputed, we will obtain and provide you with verification of the debt by mail. The name of the original creditor is Randy LeBoeuf and his address is 139 Bocage Dr., Houma, Louisiana 70360. Any dispute of the validity of the debt by you may not delay commencement of legal action by Mr. Randy LeBoeuf.

**This is an attempt to collect a debt and any information obtained from you will be utilized for that purpose.**

Sincerely yours,

Darryl T. Landwehr

cc: Mr. Randy LeBoeuf (via email)
    Ms. Loren L. Hatle (via U. S. First Class Mail)
    Clean Metal Technologies, LLC (via U. S. First Class Mail)

# ROY KIESEL FORD DOODY & NORTH

A PROFESSIONAL LAW CORPORATION

W. DAVID KIESEL*
R. BENNETT FORD, JR.*
CHAD A. GRAND*

*REGISTERED PATENT
ATTORNEY LICENSED IN
LOUISIANA & TEXAS

9100 BLUEBONNET CENTRE BOULEVARD, SUITE 100 (70809)
POST OFFICE BOX 15928
BATON ROUGE, LOUISIANA 70895-5928
TELEPHONE: (225) 927-9908
TELECOPIER: (225) 926-2685
EMAIL: info@roykiesel.com

STEPHEN R. DOODY*
BRETT A. NORTH* J.
J. MORGAN DIXON

VICTOR L. ROY, III
(1942-2012)

### *VIA EMAIL*

Friday, November 1, 2019

Mr. Loren Lee Hatle
llhatle@corrosionexchange.com

Dear Mr. Hatle,

My name is J. Morgan Dixon, and I represent Clean Metal Technologies, L.L.C. who has filed U.S. Patent Application No. 16/549,725 titled "METHODS FOR REMOVAL OF REACTION SITES ON METAL SURFACES AND APPLICATION OF A NANOTUBE CONTAINING PROTECTIVE COATING" listing you as the inventor. The application and an inventor's declaration are provided in the attachments to this email for your review. Please review the application, and sign and return the inventor's declaration. Return of the inventor's declaration via email is acceptable. If you have any questions or concerns, please contact the firm.

Enclosures:    U.S. Patent Application No. 16/549,725
               Declaration

Sincerely

// J. Morgan Dixon //

J. Morgan Dixon

G:\WORK FOLD\Client Files\12200  CLEAN METAL TECH\12200.009\12200.009-ltr re signatures from Loren Hatel.docx

EXHIBIT 5

CAUSE NO. 2019-87343

| | | |
|---|---|---|
| LOREN L. HATLE, | § | IN THE DISTRICT COURT OF |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | |
| | § | |
| CLIFFORD WRIGHT, JR.; BERKELEY | § | HARRIS COUNTY, TEXAS |
| RESEARCH GROUP, LLC; CLEVE J. GLENN; | § | |
| SEYFARTH SHAW LLP; MICROCLEAN | § | |
| METALS, LLC; and RANDY P. LEBOEUF, | § | |
| | § | |
| Defendants. | § | 333rd JUDICIAL DISTRICT |

## PLAINTIFF'S ORIGINAL PETITION

TO THE HONORABLE JUDGE OF SAID COURT:

Plaintiff Loren L. Hatle files this Original Petition against Defendants Clifford Wright, Jr.,

Berkeley Research Group, LLC, Cleve J. Glenn, Seyfarth Shaw LLP, MicroClean Metals, LLC,

and Randy P. LeBoeuf.

## I.  DISCOVERY CONTROL PLAN

1.  Plaintiff requests that the Court enter a docket control order setting the deadlines

for discovery and other pre-trial matters, in accordance with Rule 190.4 of the Texas Rules of Civil

Procedure.

## II.  CLAIM FOR RELIEF

2.  Plaintiff seeks monetary relief over $200,000 but not more than $1,000,000.

## III.  JURISDICTION AND VENUE

### A.  Jurisdiction

3.  This Court has subject matter jurisdiction because the acts and omissions

complained of occurred within the territorial boundaries of the State of Texas and the amount in

controversy exceeds the minimum jurisdictional limits of this Court.  The Court has personal

EXHIBIT 6

jurisdiction over Defendants because: (1) Plaintiff's claims arise from Defendants' contacts with Texas; (2) Defendants have actively and routinely engaged in business within Texas; and (3) the exercise of jurisdiction over Defendants comports with traditional notions of fair play and substantial justice.

**B.    Venue**

4.    Venue is proper in Harris County, Texas under section 15.002(a)(1) of the Texas Civil Practice and Remedies Code, insofar as a substantial portion of the events or omissions giving rise to Plaintiff's claims occurred in Harris County.

## IV.    **PARTIES**

5.    Plaintiff Loren L. Hatle is a resident of the State of Texas.

6.    Defendant Clifford Wright, Jr. is a resident of the State of Texas who may be served with process at his business address at 700 Louisiana Street, Suite 2600, Houston, Texas 77002.

7.    Defendant Berkeley Research Group, LLC ("BRG") is a foreign limited liability company that may be served with process by serving its Registered Agent, Cogency Global, Inc., at 1601 Elm Street, Suite 4360, Dallas, Texas 75201.

8.    Defendant Cleve J. Glenn is a resident of the State of Texas who may be served with process at his business address at 24 Greenway Plaza, Suite 1400, Houston, Texas 77046.

9.    Defendant Seyfarth Shaw LLP is a foreign limited liability partnership that may be served with process by serving its Registered Agent, Mark Coffin, at 700 Milam Street, Suite 1400, Houston, Texas 77002.

10.    Defendant MicroClean Metals, LLC is a Texas limited liability company that may be served with process by serving its President, Todd Olson, at 700 NE 4th Avenue, Camas, Washington 98607.

11.     Defendant Randy P. LeBoeuf is a resident of the State of Louisiana who may be served with process at 139 Bocage Drive, Houma, Louisiana 70360.

<h3 style="text-align:center">V.     <u>FACTUAL BACKGROUND</u></h3>

12.     Hatle invented a method to remove contaminants and other corrosive materials from concrete, metal, and other surfaces and protect such surfaces by applying coatings to prevent degradation of these surfaces.  Hatle specifically designed this method for use in the oil and gas industry and other industries operating structures and equipment in harsh environmental conditions.  On February 5, 2015, Hatle filed a provisional patent application identified by U.S. Serial No. 62/112,530 ("530 provisional application") for his invention.  Hatle subsequently filed U.S. patent application Serial No. 15/012,618 on February 1, 2016 ("618 patent application") that claimed priority to the provisional application, and which was granted on July 24, 2018 as patent number 10030310 (the "310 Patent").

13.     On February 27, 2015, LeBoeuf formed Clean Metal Technologies, L.L.C. ("CMT") specifically to make use of Hatle's intellectual property.  LeBoeuf was designated as the sole manager and a member of CMT and Hatle, along with Rocky Smith, were listed as members. Per CMT's April 1, 2015 Capital Contribution agreement, Hatle agreed to contribute his full-time services to the company and assign all of his rights under the 530 provisional application and any future patents that claimed the benefit of the filing date of this provisional application.  LeBoeuf and Smith agreed to contribute part-time services to CMT plus a combined total of $100,000 in cash.  In December 2015, Hatle sold and assigned all of his interest in and rights to the inventions disclosed in the 530 provisional application to CMT.  In exchange, Hatle received 49 units of the company's Class A voting membership interests and 86 units of the non-voting Class B membership interests, giving Hatle the largest percentage of ownership interests in CMT.  LeBoeuf

owned the other 51 Class A voting units and 69 of the Class B units. Smith held the remaining 45 units of the Class B membership interests and had no voting rights.

14.    CMT did not generate any revenue and never got off the ground. On March 4, 2016, Hatle engaged BRG to provide consulting services on strategy for CMT membership and for launching world-wide product sales. Wright is a managing director with BRG and was listed as the person who would lead the consulting services to be provided to Hatle. As part of this consulting relationship, Hatle shared the details of the technology in the 618 patent application with Wright and provided Wright with other confidential and proprietary information.

15.    In a series of events that followed that were advanced by the concerted efforts of Wright, LeBoeuf, and Glenn, Hatle would unknowingly sign over all of his rights and relinquish control to the 310 Patent to companies run by Wright.

16.    First, Glenn formed MicroClean Metals, LLC on behalf of Wright at the same time Wright was purportedly providing consulting services to Hatle as a representative of BRG. MicroClean's certificate of filing with the Texas Secretary of State became effective on May 3, 2016 and listed Glenn as the company's initial registered agent. In MicroClean's company agreement bearing the same date, Wright was listed as the sole manager and member of the company, as well as its President and CEO. Wright's listed address in the company agreement is the same as his business address with BRG. Hatle had no initial ownership interest in MicroClean, but was designated as the company's Chief Technical Officer.

17.    Second, Wright (still under the guise of consulting for BRG) convinced Hatle to purchase LeBoeuf's membership interests in CMT. Wright suggested Hatle retain Glenn, then an associate with Seyfarth Shaw LLP, to represent Hatle in the transaction. Glenn, who was supposed

to be representing Hatle, structured the deal in such a way that Hatle took all of the risk and saw no reward.

18.     On August 25, 2016, the "closing" date for the transaction, Hatle was presented with a multitude of documents to sign that he had not previously seen or been advised as to their meaning and effect.  Wright, LeBoeuf, and Glenn colluded to set values for LeBoeuf's CMT interests at amounts that were wildly disproportionate to the actual value of CMT, a company that was not established and had yet to make a profit.  According to the Membership Interest Purchase Agreement ("MIPA"), Hatle purchased LeBoeuf's membership interests in CMT for $882,000 and agreed to provide the company $100,000 as working capital.  The MIPA also required CMT to repay LeBoeuf $300,000 for a loan he never made to the company.  Much of the purchase price and loan repayment were given by promissory notes calling for monthly installments of $133,333.34 and $50,000, respectively, which were secured by the 618 patent application that resulted in the 310 Patent.  Knowing that Hatle could not afford the purchase price or any of the other cash outlays required under the MIPA, Wright and LeBoeuf pressured Hatle to sign a multitude of documents in which Hatle personally guaranteed over $1.1 million and pledged his patent as collateral.

19.     Wright, LeBoeuf, and Glenn devised a fraudulent scheme where MicroClean ended up with the rights to the 310 Patent.  Concurrent with Hatle purchasing all of LeBoeuf's membership interests in CMT that gave Hatle 100% of the Class A voting units, CMT granted MicroClean an exclusive worldwide license in the patent rights Hatle assigned to CMT in 2015 purportedly as collateral and security for the deferred payments owed to LeBoeuf.  To Hatle's knowledge, MicroClean never made any of the payments due to LeBoeuf on Hatle's or CMT's behalf.  Meanwhile, MicroClean had full and exclusive use of Hatle's technology knowing that

Hatle and CMT could not repay the debt to LeBoeuf. For his part, LeBoeuf gave Wright time to exploit the patent technology for Wright's personal gain as the CEO and President of MicroClean. This is because LeBoeuf knew that he would either get payments under an inflated sales price of his membership interests if MicroClean was able to successfully market Hatle's invention or get rights to the 310 Patent (not if, but) when Hatle undoubtedly defaulted.

20. In continuation of the fraudulent scheme, Glenn assisted Wright in having Hatle transfer all of his Class A and Class B membership units in CMT to MicroClean on September 6, 2016, days after Hatle closed on his purported purchase of LeBoeuf's CMT interests. On this same day, Wright, as the sole member and manager of MicroClean, executed a Written Consent drafted by Glenn that issued 51 membership units in MicroClean that carried 100% of the voting rights. Hatle was issued 31.25 units with 61% of the voting rights. A company called CJDW Interests, LLC was assigned 10 membership units with 20% of the voting rights. Wright and his wife, Jo Dee Wright, are listed as the managing members of CJDW. Despite Hatle being given membership interests in MicroClean, Wright and Glenn had Hatle sign a voting agreement that granted Wright an irrevocable proxy and power of attorney to vote Hatle's membership units. The alleged reason was so that Wright would have the requisite authority to make all of the material business decisions for MicroClean. However, Hatle could not withdraw this authority, nor could he transfer or otherwise encumber his membership interests in the company. Essentially, Hatle was stuck. He had no rights or control over his invention and was at the mercy of Wright, who was the only person with the authority to exploit Hatle's technology.

21. Hatle never had the funds to pay LeBoeuf $882,000, provide CMT with $100,000 in working capital, or repay a $300,000 loan. Wright, LeBoeuf, and Glenn knew this from the beginning but took advantage of Hatle's relationship of trust with Wright and Glenn, each who

owed Hatle a fiduciary duty. Hatle's first payment to LeBoeuf was due three months after the August 25, 2016 closing and the installment payments were scheduled to begin 18 months after closing. Three years passed with no payments made by Hatle, just as Wright, LeBoeuf, and Glenn expected.

22. During this time, Hatle severed ties with MicroClean due to mounting financial pressures as a result of no salary and no reimbursement of expenses. Hatle went on to file a new patent application that contains different and distinct technology from the 310 Patent. This notwithstanding, LeBoeuf has resurfaced apparently seeing an opportunity to once again commandeer Hatle's intellectual property. LeBoeuf is now claiming that Hatle owes him the principal amounts of $882,000 and $300,000 plus interest for LeBoeuf's membership interests in CMT and loan to the company. LeBoeuf is also requesting that Hatle sign an Inventor's Declaration relative to a patent application that LeBoeuf had his attorneys file on August 23, 2019 listing Hatle as the inventor. This most recent application filed by LeBoeuf's attorneys is an attempt to highjack novel technology, complete with Hatle's new ingredients and new claims.

23. LeBoeuf's latest efforts are predicated on a series of documents to which Hatle's signature was procured by fraud. As a result, the documents are void ab initio and have no force or effect.

24. Defendants structured the transaction between LeBoeuf and Hatle so that it would benefit Wright and LeBoeuf to Hatle's detriment. Defendants were only concerned with their own self-interests and did little to protect the interests of Hatle, the person Defendants were paid to represent. Among other things, Defendants breached their fiduciary duties to Hatle and committed fraud. Hatle suffered substantial harm as a result.

# VI. CAUSES OF ACTION

## A. Seyfarth Shaw and Glenn

25.     Wright suggested that Hatle retain Glenn to represent Hatle in the LeBoeuf transaction. At the time, Glenn was an attorney with Seyfarth Shaw. Hatle did as Wright suggested and retained Glenn. Glenn, however, failed to provide adequate representation to Hatle. Among other things, Glenn had very few communications with Hatle, failed to explain the transaction documents to him, and structured the deal allowing Hatle to incur significant obligations that Glenn knew Hatle could not pay. Upon information and belief, Glenn acted in concert with Wright to construct a sale of LeBoeuf's membership interests in CMT so that it would benefit Wright and LeBoeuf to Hatle's detriment. At a minimum, Glenn committed malpractice. No attorney or other advisor truly representing Hatle's interests would broker, let alone permit Hatle to enter into, such a deal.

26.     Moreover, the MIPA and related agreements transferring the rights to the inventions in the 618 patent application (which resulted in the 310 Patent) and all of Hatle's membership units from CMT to MicroClean and granting Wright an irrevocable voting proxy and power of attorney were never explained to Hatle prior to Glenn presenting the documents for Hatle to sign. Hatle did not learn of the effect of these agreements until much later in time and it was neither Glenn nor Wright who ever explained to Hatle what the documents meant.

### 1. Legal Malpractice

27.     Plaintiff re-alleges and incorporates by reference the allegations in the foregoing paragraphs.

28.     An attorney-client relationship existed between Hatle and Seyfarth and Glenn with respect to Hatle's transaction with LeBeouf, and Seyfarth and Glenn owed a duty to Hatle.

29.     Seyfarth and Glenn breached such duty by failing to comply with the applicable standard of care.

30.     Such breach proximately caused Hatle injury.

31.     Damages occurred.

32.     In addition to seeking an award of damages, Hatle seeks an award of exemplary damages.

**2.   Breach of Fiduciary Duty**

33.     Plaintiff re-alleges and incorporates by reference the allegations in the foregoing paragraphs.

34.     There was a fiduciary duty between Hatle and Seyfarth and Glenn.

35.     Seyfarth and Glenn breached their fiduciary duty to Hatle.

36.     Such breach proximately caused injury to Hatle and benefited Seyfarth and Glenn.

37.     In addition to seeking an award of damages, Hatle seeks an award of exemplary damages.

**3.   Deceptive Trade Practices Act**

38.     Plaintiff re-alleges and incorporates by reference the allegations in the foregoing paragraphs.

39.     Plaintiff was a consumer for purposes of the Texas Deceptive Trade Practices Act.

40.     Seyfarth and Glenn can be sued under the Texas Deceptive Trade Practices Act.

41.     Seyfarth and Glenn committed wrongful acts under the Texas Deceptive Trade Practices Act.  Among other things, Seyfarth and Glenn failed to disclose information concerning services which was known at the time of the transaction, intending to induce Hatle into a transaction into which he would not have entered had the information been disclosed.  Seyfarth and Glenn also committed an unconscionable action or course of action.

42.     Seyfarth and Glenn committed these wrongful acts knowingly. Hatle is entitled to his attorney's fees and may also recover damages for mental anguish and up to three times the amount of economic damages.

**4.      Fraud by Nondisclosure**

43.     Plaintiff re-alleges and incorporates by reference the allegations in the foregoing paragraphs.

44.     Seyfarth and Glenn failed to disclose material facts.

45.     Seyfarth and Glenn had a duty to disclose such facts to Hatle.

46.     Hatle was ignorant of the facts and did not have an equal opportunity to discover them.

47.     Seyfarth and Glenn intended Hatle to act or refrain from acting based on the nondisclosure.

48.     Hatle relied on the non-disclosure, which resulted in injury.

**5.      Aiding and Abetting—Assisting and Participating**

49.     Plaintiff re-alleges and incorporates by reference the allegations in the foregoing paragraphs.

50.     Wright and LeBoeuf each individually committed a tort against Hatle.

51.     Seyfarth and Glenn provided substantial assistance to both Wright and LeBoeuf in accomplishing the tortious result.

52.     Seyfarth and Glenn's conduct in assisting Wright and LeBoeuf was a breach of Seyfarth's and Glenn's fiduciary duty to Hatle.

53.     Seyfarth's and Glenn's participation was a substantial factor in causing the tort against Hatle.

## B.  BRG and Wright

54.  On or around March 4, 2016, Hatle retained BRG to help CMT realize revenue from the 310 Patent.  Wright was the lead consultant and in this position of trust, convinced Hatle that it was in his best interests to purchase LeBoeuf's membership units in CMT.  Little did Hatle know, however, that Wright was colluding with LeBoeuf and saw an opportunity to steal Hatle's technology.  Wright and LeBoeuf devised a sale of LeBoeuf's membership interests so that it would benefit both of them to Hatle's detriment.

### 1.  Breach of Fiduciary Duty

55.  Plaintiff re-alleges and incorporates by reference the allegations in the foregoing paragraphs.

56.  There was a fiduciary duty between Hatle and BRG and Wright.

57.  BRG and Wright breached their fiduciary duty to Hatle.

58.  Such breach proximately caused injury to Hatle and benefited BRG and Wright.

59.  In addition to seeking an award of damages, Hatle seeks an award of exemplary damages.

### 2.  Deceptive Trade Practices Act

60.  Plaintiff re-alleges and incorporates by reference the allegations in the foregoing paragraphs.

61.  Hatle was a consumer for purposes of the Texas Deceptive Trade Practices Act.

62.  BRG and Wright can be sued under the Texas Deceptive Trade Practices Act.

63.  BRG and Wright committed wrongful acts under the Texas Deceptive Trade Practices Act.  Among other things, BRG and Wright failed to disclose information concerning services which was known at the time of the transaction, intending to induce Hatle into a

transaction into which he would not have entered had the information been disclosed. BRG and Wright also committed an unconscionable action or course of action.

64. BRG and Wright committed these wrongful acts knowingly. Hatle is entitled to his attorney's fees and may also recover damages for mental anguish and up to three times the amount of economic damages.

**3.    Fraud by Nondisclosure**

65. Plaintiff re-alleges and incorporates by reference the allegations in the foregoing paragraphs.

66. BRG and Wright failed to disclose material facts.

67. BRG and Wright had a duty to disclose such facts to Hatle.

68. Hatle was ignorant of the facts and did not have an equal opportunity to discover them.

69. BRG and Wright intended Hatle to act or refrain from acting based on the nondisclosure.

70. Hatle relied on the non-disclosure, which resulted in injury.

**4.    Fraudulent Inducement**

71. Plaintiff re-alleges and incorporates by reference the allegations in the foregoing paragraphs.

72. BRG and Wright made a material representation to Hatle. Namely, Wright, as a representative, agent, and employee of BRG, represented to Hatle that it was in his best interests to purchase LeBeouf's membership units in CMT with the ultimate goal of taking the technology of the 310 Patent for himself. This representation was false.

73. BRG and Wright either knew this representation was false or made it recklessly, as a positive assertion, without knowledge of its truth.

74.     BRG and Wright made this representation with the intent that it be acted on by Hatle.

75.     Hatle relied on the representation, which caused him injury.

**5.      Aiding and Abetting—Assisting and Participating**

76.     Plaintiff re-alleges and incorporates by reference the allegations in the foregoing paragraphs.

77.     Glenn and LeBoeuf each individually committed a tort against Hatle.

78.     BRG and Wright provided substantial assistance to both Glenn and LeBoeuf in accomplishing the tortious result.

79.     BRG's and Wright's conduct in assisting Glenn and LeBoeuf was a breach of BRG's and Wright's fiduciary duty to Hatle.

80.     BRG's and Wright's participation was a substantial factor in causing the tort against Hatle.

**C.      Wright, LeBoeuf, and Glenn**

**1.      Fraudulent Inducement**

81.     Plaintiff re-alleges and incorporates by reference the allegations in the foregoing paragraphs.

82.     Wright, LeBoeuf, and Glenn made material representations to Hatle.  Namely, Wright, LeBoeuf, and Glenn represented to Hatle that the value of LeBoeuf's membership interests in CMT were worth more than they actually were and that LeBoeuf loaned $300,000 to CMT. These representations were false.

83.     Wright, LeBoeuf, and Glenn either knew the representations were false or made them recklessly, as a positive assertion, without knowledge of the statements' truth.

84.     Wright, LeBoeuf, and Glenn made these representations with the intent that it be acted on by Hatle.

85.     Hatle relied on the representations, which caused him injury.

**2.      Civil Conspiracy**

86.     Plaintiff re-alleges and incorporates by reference the allegations in the foregoing paragraphs.

87.     Wright, LeBoeuf, and Glenn joined together to commit an unlawful purpose.

88.     Wright, LeBoeuf, and Glenn had a meeting of the minds to take Hatle's patent technology and exclude him from the benefits of his own invention.

89.     Wright, LeBoeuf, and Glenn each and all committed an unlawful, overt act to further their concerted efforts against Hatle.

90.     Hatle suffered injury as a proximate result of Wright, LeBoeuf, and Glenn's wrongful acts.

**3.      Aiding and Abetting—Assisting or Encouraging**

91.     Plaintiff re-alleges and incorporates by reference the allegations in the foregoing paragraphs.

92.     Wright, LeBoeuf, and Glenn each individually committed a tort against Hatle.

93.     Wright, LeBoeuf, and Glenn had knowledge that the other's conduct constituted a tort.

94.     Wright, LeBoeuf, and Glenn each had the intent to assist the other in committing the tort against Hatle and provided assistance and encouragement in carrying out the act.

95.     Wright's, LeBoeuf's, and Glenn's assistance and encouragement was a substantial factor in causing the tort against Hatle.

**D.  LeBoeuf and MicroClean**

**1.  Declaratory Judgment**

96.  Plaintiff re-alleges and incorporates by reference the allegations in the foregoing paragraphs.

97.  Pursuant to the Uniform Declaratory Judgments Act, Texas Civil Practice and Remedies Code § 37.001, *et seq.*, Hatle requests that the Court enter declaratory judgment in his favor, as follows:

> (a)  The MIPA and related documents, including promissory notes in favor of LeBoeuf and security agreements, are and were void ab initio because Hatle's agreement to enter into the documents was procured by fraud; and

> (b)  The agreements transferring Hatle's membership units in CMT and rights to the 618 patent application to MicroClean and related documents, including voting agreement and any security agreements, are and were void ab initio because Hatle's agreement to enter into the documents was procured by fraud.

98.  Pursuant to section 37.009 of the Texas Civil Practice and Remedies Code, Hatle is entitled to recover his reasonable and necessary attorneys' fees and expenses incurred by reason of the necessity to bring this cause of action.

## VII.  CONDITIONS PRECEDENT

99.  All conditions precedent to Hatle's recovery and the claims made the subject of this petition have been performed or have occurred.

## VIII.  REQUEST FOR DISCLOSURE

100.  Pursuant to Rule 194 of the Texas Rules of Civil Procedure, Hatle requests that Defendants each disclose, within 50 days of service of this request, the information or material described in Rule 194.2.

## IX.    PRAYER

WHEREFORE, Plaintiff respectfully requests that the Court enter judgment against Defendants and award Plaintiff his court costs, reasonable and necessary attorneys' fees and expenses, actual damages, exemplary damages, and pre- and post-judgment interest.  Plaintiff further requests that the Court grant him such other and further relief at law or in equity to which he may be justly entitled.

Dated: December 11, 2019                    Respectfully Submitted,

**JOHNSEN LAW PLLC**

By:  */s/ Tamara D. Stiner Toomer*
      Tamara D. Stiner Toomer
      State Bar No. 24043940
      tamara@johnsenlaw.com
      Christopher Johnsen
      State Bar No. 24072169
      chris@johnsenlaw.com
      316 East Main Street, Suite 2D
      Humble, Texas 77338
      Telephone: (832) 786-8646

***Counsel for Plaintiff Loren L. Hatle***