UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| **RANDY LEBOEUF** | * | CIVIL ACTION NO. 2:20-cv-00105 |
| | * | |
| V. | * | SECTION "E" (3) |
| | * | |
| **LOREN L. HATLE, CLEAN** | * | |
| **METAL TECHNOLOGIES, LLC AND** | * | |
| **MICRO CLEAN METALS, LLC** | * | |

**REPLY BRIEF IN RESPONSE TO DEFENDANT'S OPPOSITION TO PLAINTIFF'S MOTION TO REMAND AND TO AWARD COSTS AND ATTORNEY'S FEES**

Plaintiff Randy LeBoeuf submits this brief in reply to the Opposition to Plaintiff's Motion to Remand and to Award Costs and Attorney's Fees ("Opposition") filed by the defendant Loren Hatle ("Hatle"). [Rec. Doc. 10]. First and foremost, the incorporation of the forum selection clause or provision in the MIPA and ancillary documents (hereinafter collectively the "MIPA") was a product of Hatle's own initial proposal made to Mr. LeBoeuf to induce him to sell his membership interest in CMT to Hatle and, therefore, could not be the product of any fraud perpetrated by Mr. LeBoeuf. Second, Hatle's Opposition is a veiled attempt to have the U.S. District Court impermissibly pre-try his purported claims and plaintiff's case to determine removable jurisdiction.

**Background**

As reflected in the Petition filed by Mr. LeBoeuf in the 32nd Judicial District Court against Hatle, Mr. LeBoeuf's claims with respect to Hatle arise from Hatle's purchase of Mr. LeBoeuf's membership interest in CMT pursuant to the MIPA. [R. Doc. 1, # 2, ¶¶ 13, 18].[1] The MIPA is attached as Exhibit "2" to Mr. LeBoeuf's Affidavit. The execution of the MIPA, however, occurred only after a chain of events set in motion by Hatle which provide important context to Hatle's allegations, and evidence the inaccuracy thereof.

---

[1] Mr. LeBoeuf attaches and incorporates by reference to this reply brief, as if fully set forth herein, an Affidavit establishing all facts relied upon. See Exhibit "A" hereto.

CMT was formed in 2015 as a Louisiana limited liability company after Hatle approached Mr. LeBoeuf and asked him to provide financing so that Hatle could commercialize his inventions. [Exhibit "A-2"]. Hatle understood that Mr. LeBoeuf had extensive connections in the target market for Hatle's inventions due to Mr. LeBoeuf's own background in the same industry. [Exhibit "A", ¶ 5]. Mr. LeBoeuf only agreed to get involved if appropriate patent protection could be obtained, and a company was created to own and commercialize the intellectual property. [Exhibit "A", ¶ 6]. Accordingly, Mr. LeBoeuf obtained a patent attorney who prepared and filed Hatle's 62/112,530 Provisional Patent Application. [Exhibit "A", ¶ 6]. After that application was filed, Mr. LeBoeuf, Hatle and another partner formed CMT as a Louisiana limited liability company to sell products and services utilizing the intellectual property that Hatle assigned to CMT for the purpose of securing Mr. LeBoeuf's investment. [Exhibit "A", ¶ 6-7]. This included not only the provisional patent application and all subsequent patent applications claiming priority to it, but all of Hatle's inventions conceived by Hatle from January 1, 2015 until one year after his services to CMT were concluded. [Exhibit "A", ¶ 7].

Mr. LeBeouf owned the controlling interest in CMT, while Hatle owned a minority interest. [Exhibit "A", ¶ 8]. Hatle, in addition to owning shares in CMT, was also employed as CMT's president, and agreed to devote his full-time services to CMT. [Exhibit "A", ¶ 8]. Mr. LeBoeuf loaned CMT funds to pay Hatle an annual salary and to provide Hatle with a company vehicle, cell phone, computer, and travel, business and entertainment expenses. [Exhibit "A", ¶ 8]. Mr. LeBoeuf also provided funds to CMT for payment on company insurance, rent, start-up assets, and secretarial salary. [Exhibit "A", ¶ 8].

Soon after CMT's formation in August of 2015, Mr. LeBoeuf learned that an attorney representing The Tagos' Group, LLC ("Tagos") had warned Hatle that Hatle owed duties of confidentiality and non-competition to his prior employer CorrLine International, which had apparently been acquired by Tagos. [Exhibit "A", ¶ 9]. Hatle denied he had entered into any such agreements, but this proved to be false.

[Exhibit "A", ¶ 9]. Mr. LeBoeuf loaned CMT the funds necessary to defend against the allegations. [Exhibit "A", ¶ 9].

In March of 2016, Mr. LeBoeuf discovered that Hatle had falsely represented to a different company, by the name of "SDS Bionic", that he was the majority shareholder in CMT and had full rights to negotiate with regard to the sale of CMT's intellectual property. [Exhibit "A", ¶ 10]. In violation of his agreements and duties to CMT, Hatle disclosed to SDS Bionic confidential information related to CMT's intellectual property and even requested that SDS Bionic begin manufacturing products utilizing that intellectual property. [Exhibit "A", ¶ 10]. Mr. LeBoeuf also discovered that Hatle had attended at least two trade shows and not on behalf of CMT but as SDS Bionic's Chief Technical Officer, and for the purpose of promoting SDS Bionic's product called "Nano Clean Pro", which apparently employed CMT's intellectual property. [Exhibit "A", ¶ 10]. Mr. LeBoeuf also learned Hatle had entered into separate talks with SDS Bionic that included Clifford Wright, and that Mr. Wright, acting on Hatle's behalf, had indicated to SDS Bionic that it was not to have any contact with anyone at CMT other than Hatle, so that Hatle could purchase control of CMT. [Exhibit "A", ¶ 10]. Mr. LeBoeuf therefore advised Mr. Wright, via a letter sent from Louisiana, that the discussions Hatle and Mr. Wright were engaged in had not been authorized by CMT and should be immediately discontinued. [Exhibit "A", ¶ 11].

In view of Hatle's multiple breaches of his agreement and the duties owed to CMT, CMT terminated Hatle's employment contract for cause on April 5, 2016. [Exhibit "A", ¶ 12]. The very next day, on April 6, 2016, Mr. LeBoeuf received a letter from Cleve Glenn, who explained that he was an attorney for Hatle and who threatened legal action on behalf of Hatle due to the termination. [Exhibit "A", ¶ 10]. At this point, Mr. LeBoeuf wanted nothing more to do with Hatle. After Mr. LeBeouf immediately replied to Mr. Glenn, via an email communication, that a response would be forthcoming, Mr. LeBoeuf's business attorney, who was located in Louisiana, responded to Mr. Glenn. [Exhibit "A", ¶ 12]. Mr. LeBeouf never dealt directly with Mr. Glenn, except for the initial response after receiving his letter.

[Exhibit "A", ¶ 12-13]. Mr. Glenn then proposed to Mr. LeBoeuf's attorney, as a resolution of Hatle's issues, that Hatle buy Mr. LeBoeuf's membership interest in CMT. [Exhibit "A", ¶ 13]. Mr. LeBoeuf never asked Hatle to buy Mr. LeBoeuf's membership interest in CMT, nor did he ever propose such a purchase to Mr. Glenn. [Exhibit "A", ¶ 13].

In May of 2016, and after further negotiations between Hatle's attorney and Mr. LeBoeuf's attorney, Hatle's attorney sent an execution copy of a letter of intent to Mr. LeBoeuf's attorney containing the basic intended terms for purchase of Mr. LeBoeuf's membership interest in CMT. [Exhibit "A", ¶ 14]. Mr. LeBoeuf signed the letter of intent in Louisiana. [Exhibit "A", ¶ 14]. In this letter of intent, dated May 6, 2016, signed by Hatle, Hatle expressly proposed in part, the following: (a) the purchase price for Mr. LeBoeuf's membership interest in CMT to be $872,000.00, payable as follows: (i) $72,000.00 at the closing of the transaction; (ii) $800,000.00 of the purchase price (i.e., the "Deferred Purchase Price Consideration") within 18 months after the closing and to be paid by Hatle in six principal installment payments of $133,333.34, plus accrued interest every three months until the balance is fully paid; (iii) at the closing, Hatle shall provide to CMT funds in the amount of $100,000.00 to be used to pay company debts owed to third parties; (iv) $300,000.00 to be repaid (i.e., the Deferred Loan Repayment") by CMT to Mr. LeBoeuf in six principal installments of $50,000.00 each, plus accrued interest; (v) to finance the transaction, Hatle will form a new Texas limited liability company (i.e., "NEWCO") and revenue from NEWCO will be used to fund the Deferred Consideration; (vi) the Deferred Purchase Price Consideration and the Deferred Loan Repayment shall be secured by that certain U.S. Patent Application filed on February 1, 2016; and (vii) the Deferred Purchase Price Consideration and the Deferred Loan Repayment Consideration shall be secured by personal guarantees executed in favor of Mr. LeBoeuf by NEWCO, Hatle and CMT.[2]

---

[2] A true and correct copy of the letter of intent is attached to the Affidavit of Randy LeBoeuf as Exhibit "1". See Exhibit "A", ¶ 15, and Exhibit "A-1".

In the May 6, 2016 letter of intent, Hatle proposed and it provided the following with respect to the governing law thereof, to-wit:

> SUBJECT TO PARAGRAPH 15 BELOW, THIS LETTER SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH INTERNAL LAWS OF THE STATE OF LOUISIANA, WITHOUT GIVING EFFECT TO ANY CHOICE OR CONFLICT OF LAW PROVISION OR RULE (WHETHER OF THE STATE OF LOUISIANA OR ANY OTHER JURISDICTION) THAT WOULD CAUSE THE APPLICATION OF LAWS OF ANY JURISDICTION OTHER THAN THOSE OF THE STATE OF LOUISIANA. [EXHIBIT "A-1", P. 5, ¶ 9].

Also in the May 16, 2016 letter of intent, Hatle proposed and it provided the following forum selection clause or provision with respect to disputes related to the letter or to the anticipated MIPA, referred to therein as the "Definitive Agreement", and the ancillary documents, including the Promissory Notes, the Security Agreement and any guarantees, to-wit:

> **<u>Governing Law, Jurisdiction and Venue</u>**.
> (a) <u>Party Proceedings</u>. The Parties agree that the exclusive jurisdiction and venue to resolve any disputes *related solely* to this Letter or the Definitive Agreement (and ancillary documents, including the promissory notes, the Security Agreement, any guarantees and any indemnities) shall be exclusively held and prosecuted in the 32nd Judicial District Court, Terrebonne Parish, Louisiana. Likewise, the governing law for any disputes *related solely* to this Letter or the Definitive Agreement (and ancillary documents, including the promissory notes, the Security Agreement, any guarantees and any indemnities) shall be Louisiana without giving effect to any choice or conflict of law provision or rule (whether of the State of Louisiana or any other jurisdiction, that could cause the application of laws of any jurisdiction other than those of the State of Louisiana. [Exhibit "A-1", pgs. 6 and 7, ¶ 15(a)].

The parties' attorneys subsequently finalized the terms of the sale, which ultimately were set forth in the MIPA. [Exhibit "A", ¶ 15]. Mr. LeBoeuf's only involvement in the negotiation of the MIPA was communicating through his attorney in Louisiana. [Exhibit "A", ¶ ¶ 13-16]. Mr. LeBeouf never sought out Hatle or asked Hatle to buy his membership interest in CMT, but was approached in Louisiana by Hatle via Cleve Glenn. [Exhibit "A", ¶ 13].

On October 30, 2019, counsel for Mr. LeBoeuf sent to Hatle written demand for payment of the balances due on the Deferred Purchase Price Consideration Note and the Deferred Loan Repayment Note,

and further informed Hatle that legal proceedings would be instituted if the outstanding balances due thereon was not paid. [R. Doc. 1, #6]. Thereafter, and one day prior to service of the Petition on Hatle [R. Doc. 9], Hatle filed a lawsuit against Mr. LeBoeuf, Wight, and Glenn in the State District Court of Harris County, Texas, seeking declaratory judgment that the MIPA and its ancillary documents are void as procured by fraud. [R. Doc. 10-1, # 6, ¶¶ 96-98]. Summarily, all of Hatle's causes of action in the Texas action relate to the MIPA or are derivative claims based on other torts.[3]

On January 27, 2020, Mr. LeBoeuf filed a Special Appearance in Texas action seeking to dismiss Hatle's suit as to him. [Exhibit "A", ¶ 19, and Exhibit "A-3"].

**Argument and Applicable Law**

(I) <u>The forum selection clause or provision of the MIPA was proposed by and is enforceable against Hatle.</u>

The inclusion of the forum selection clause in the MIPA was the product of Hatle's own proposal in connection with his offer to purchase Mr. LeBoeuf's membership interest in CMT, and not the product of any fraud perpetrated by Mr. LeBoeuf, as this very same clause was contained in a letter of intent sent by Hatle to Mr. LeBoeuf prior to the said parties' execution of the MIPA. Hatle signed the letter of intent and the MIPA. Therefore, Hatle is deemed to have constructive knowledge of the contents thereof.

The MIPA was dated and entered into by Mr. LeBoeuf and Hatle on August 25, 2016. [Exhibit "A-2"]. More than three months prior thereto, Hatle executed a letter of intent, under date of May 6, 2016, therein proposing to purchase Mr. LeBoeuf's membership interest in CMT. [Exhibit "A-1"]. Included in that letter of intent, specifically in paragraph 15 thereof, was a forum selection clause or provision stating that "the exclusive jurisdiction and venue to resolve any disputes *related solely* to this letter or the Definitive Agreement (and ancillary documents, including the Promissory Notes, the Security Agreement,

---
[3] See Exhibit "6" to Exhibit "A" of Hatle's Opposition to Plaintiff's Motion to Remand and to Award Costs and Attorney's Fees (i.e., the "Opposition") [R. Doc. 10-1].

any guarantees and any indemnities) shall be exclusively held and prosecuted in the 32nd Judicial District Court, Terrebonne Parish, State of Louisiana."[4] This proposed forum selection clause was identical to the forum selection clause that was ultimately contained in the MIPA. In fact, in section 7.11(a) of the MIPA it expressly states that the parties agree that "the exclusive jurisdiction and venue to resolve any disputes related solely to this Agreement (and ancillary documents, including the promissory notes, the Security Agreement, any guarantees and any indemnities) shall be exclusively held and prosecuted in the 32nd Judicial District Court, Terrebonne Parish, State of Louisiana." [Exhibit "A-2", section 15(a)]. Thus, how the inclusion of the forum selection clause in the MIPA that was to be drafted by Hatle's own counsel could be the product of fraud is inexplicable when Hatle's own letter of intent expressly provided for the very same exclusive forum selection clause to be included in the MIPA in the first instance.

Further, Hatle's letter of intent proposed a purchase price of $872,000.00 for Mr. LeBoeuf's membership interest in CMT, and that purchase price, including the installment provisions with respect to the payment thereof, were identical to the purchase price and installment payment provisions that were contained in the MIPA. [Exhibit "A-1", ¶ 1(a) - (iv), and Exhibit "A-2", section 1.02(a) – 1.04]. Moreover, at no point in time did Mr. LeBoeuf negotiate or discuss the MIPA or its ancillary documents with Hatle prior to or at the time of Mr. LeBoeuf's signing of the MIPA. These very facts, which Hatle fails to mention in his Opposition, clearly belie and dispel Hatle's representations that the MIPA that he and Mr. LeBoeuf executed was a product of fraud by Mr. LeBoeuf.

Fraud and overreaching must be specific to a forum selection clause in order to invalidate it. *Haynsworth v. The Corporation*, 171 F.3d 956, 963 (5th Cir. 1997). In other words, the inclusion of a forum selection clause in a contract must be the product of fraud or coercion to invalidate it. *Id*. Allegations of such conduct as to the contract as a whole - or portions of it other than the forum selection

---

[4] The "Definitive Agreement" is defined therein as "a definitive purchase agreement . . . relating to Buyer's acquisition of the units, to be drafted by Buyer's counsel". See Exhibit "A-1", page 3, ¶ 2, and page 6, ¶ 15(a).

clause – are insufficient, as the claims of fraud or overreaching must be aimed straight at the forum selection clause in order to succeed. *Id.* (citing *Prima Paint Corp. v. Flood and Conklin Mfg. Co.*, 388 U.S. 395, 87 S.Ct. 1801, 18 L.Ed. 1270 (1967)).

The allegations of Hatle espoused in his Opposition purport to assert that the MIPA was procured by fraud as opposed to the forum selection clause itself. While Hatle makes the blanket and unsupportable statement that "it is undeniable in the present case that the incorporation of the forum selection clause into the Contract was a product of fraud," Hatle states that (i) LeBoeuf knew before contracting with Hatle that Hatle could not and would not ever be able to afford the purchase price of LeBoeuf's membership interest in CMT; (ii) LeBoeuf admitted this much to Hatle; (iii) LeBoeuf conspired with Wright and Glenn to induce Hatle to sign contracts that contractually obligated him for over $1.1 million, which they knew he could not repay; (iv) LeBoeuf knew litigation was inevitable before ever entering into the purchase agreements with Hatle; and (v) Hatle, on the other hand, was ignorant of the scheme being carried out against him. [R. Doc. 10, pgs. 10-11]. These allegations of fraud, however, go clearly to the conduct surrounding the whole of the MIPA itself, and such alleged conduct is insufficient to support the type of fraud and/or overreaching that would invalidate the forum selection clause of the MIPA and its ancillary documents.

As reflected in Mr. Hatle's letter of intent and proposal made to Mr. LeBoeuf to purchase Mr. LeBoeuf's membership interest in CMT, it was Hatle himself who proposed (i) the purchase price of $872,000.00 for Mr. LeBoeuf's membership interest in CMT; (ii) to secure the Deferred Purchase Price Consideration and the Deferred Loan Repayment with CMT's interest in a certain U. S. patent application, and (iii) to provide Mr. LeBoeuf with a personal guarantee of Hatle as security for the two notes. [Exhibit "A-1", ¶'s 1(a), (i), (ii), (vi) and (vii)].

Turning to the forum selection clause itself, Hatle purports to allege that (i) he was not advised of and did not understand the implications of the forum selection clause; (ii) Glenn and Wright conspired

with LeBoeuf to fraudulently induce Hatle's unknowing agreement to forum selection provisions which would require Hatle to travel to LeBoeuf's hometown; and (iii) the fraudulent actions of these parties extended specifically to the forum selection clauses of the contracts.

The afore-mentioned allegations of Hatle, however, do not specifically state how Hatle was defrauded with respect to the inclusion of the forum selection clause in the MIPA. More significantly, the afore-mentioned allegations are flatly contradicted and belied by the very terms and provisions proposed by Hatle himself in his pre-MIPA letter of intent addressed to Mr. LeBoeuf.

In general, individuals are charged with knowledge of the content of documents they sign - that is they have "constructive knowledge" of those contents. See *Consolidated Edison Co. v. U.S.A.*, 221 F.3d 364 (2nd Cir. 1999) (citing *Betaco, Inc. v. Cessna Aircraft Co.*, 32 F.3d 1128, 1136 (7th Cir. 1994) ("as a result of [the duty to read the contract] a person who signs a written contract is bound by its terms regardless of his or failure to read and understand its terms").

Hatle does not dispute that he signed the MIPA or that it contains a forum selection clause that is virtually identical to the forum selection clause contained in his letter of intent submitted to Mr. LeBoeuf more than three months prior to his signing of the MIPA. That letter of intent of Hatle evidences that there were no fraudulent actions by Mr. LeBoeuf in connection with the incorporation of that same proposed forum selection clause or provision in the MIPA.

In addition, Hatle's attempts to have the U. S. District Court adjudicate his claims of purported fraud, in the context of a removal, are improper. The Fifth Circuit has frequently cautioned the district courts against pre-trying a case to determine removal of jurisdiction. See *Carriere v. Sears Roebuck Co.*, 893 F.2d 98, 100 (5th Cir. 1990) (citing *B., Inc. v. Miller Brewing Co.*, 663 F.2d 545 (5th Cir. 1981)). While the Fifth Circuit has also endorsed a summary judgment-like procedure for disposing of fraudulent joinder claims, the instant action does not involve a fraudulent joinder question. The only person and entities that were made defendants in Mr. LeBoeuf's Petition were Hatle and those entities that were

parties to the MIPA. Hence, no person or entity has been joined as a party defendant or party plaintiff for the purpose of "creating" or obtaining jurisdiction. Nonetheless, and to the extent the Court does decide to engage in such a summary judgment-like procedure, Hatle's very own initial proposal to Mr. LeBoeuf to have the forum selection clause in the MIPA, as evidenced by his pre-MIPA letter of intent, negate and dispel Hatle's allegations of fraud with respect to the exclusive forum selection clause or provision contained in those contracts.

Mr. LeBoeuf reserves the right to submit a motion to the Court further addressing and establishing the amount of his attorney's fees and costs incurred in connection with Hatle's improper removal in the event of the remand of this matter.

Respectfully submitted,

*/s/ Darryl T. Landwehr*
DARRYL T. LANDWEHR (17677)
935 Gravier Street, Suite 835
New Orleans, Louisiana 70112
Telephone: (504) 561-8086
Attorneys for Randy Leboeuf, Plaintiff

**CERTIFICATE OF SERVICE**

I hereby certify that a copy of the above and foregoing Reply Brief in Response to Defendant's Opposition to Plaintiff's Motion to Remand and to Award Costs and Attorney's Fees has been electronically filed with the Clerk of Court and served upon all counsel of record using the Court's CM/ECF system, on the 27th day of February, 2020.

*/s/ Darryl T. Landwehr*
Darryl T. Landwehr (17677)