# EXHIBIT A

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| **RANDY LEBOEUF** | * | CIVIL ACTION NO. 2:20-cv-00105 |
| | * | |
| V. | * | SECTION "E" (3) |
| | * | |
| **LOREN L. HATLE, CLEAN** | * | |
| **METAL TECHNOLOGIES, LLC AND** | * | |
| **MICRO CLEAN METALS, LLC** | * | |

## AFFIDAVIT OF RANDY LEBOEUF

**STATE OF LOUISIANA**

**TERREBONNE PARISH**

BEFORE ME, the undersigned authority, on this day personally appeared Randy P. LeBoeuf, who swore or affirmed to tell the truth, and stated as follows:

1. My name is Randy P. LeBoeuf. I am over the age of 18, of sound mind, and capable of making this sworn statement. I have personal knowledge of the facts as stated here. The facts stated here are true and correct, based on my own personal knowledge and observations, and are made to the best of my knowledge and recollection.

2. I am a resident of Louisiana. My home address is 139 Bocage Drive Houma, Louisiana, 70360. I have never resided in Texas.

3. I am the CEO and founder of a Louisiana company, Innovative Surface Prep LLC ("ISP"), which provides equipment and technology related to ultra-high pressure water blasting and robotics in the context of heavy industrial surface preparation and cleaning. In my capacity as CEO, I occasionally travel to Texas for business on behalf of ISP.

4. I first met Loren Hatle around early 2014. Mr. Hatle, along with two other individuals (Kurt Chrisman and Santiago Hernandez) came to my place of business in Houma, Louisiana, to demonstrate a product for cleaning metal surfaces. Mr. Hatle contacted me later that same year, proposing various business opportunities. Mr. Hatle contacted me around August 2014, asking to meet

me to discuss a business opportunity related to the bankruptcy of his previous company, CorrLine International. I told Mr. Hatle that I would be coming into Houston in late August to attend an LSU football game at Reliant/NRG stadium. Mr. Hatle and Mr. Chrisman met me in the parking lot at the stadium. Mr. Hatle asked me to financially back him in purchasing CorrLine's assets out of bankruptcy. I declined. This is the only meeting between myself or Mr. Hatle that I recall ever occurring in Texas at any point in time.

5. Mr. Hatle continued to stay in touch by phone, attempting to get me to reconsider. Around November or December of 2014, Mr. Hatle contacted me regarding certain inventions. Hatle claimed to have invented novel technology related to industrial cleaning. Hatle asked me to provide financing so that he could commercialize his inventions. He also understood that, because of my background in the business, I had extensive connections in the target market for his inventions.

6. After reviewing Mr. Hatle's proposal, I agreed that it seemed like a good investment, but only if the inventions had appropriate patent protection and an appropriate corporate vehicle was created to own and commercialize the intellectual property. In December 2014 I sent Mr. Hatle a proposed organization document for a new company to be formed. I also retained and paid Mr. David Kiesel, a patent attorney in Baton Rouge, Louisiana. In January 2015, Mr. Hatle sent information regarding his invention to David Kiesel for review. Mr. Kiesel prepared a provisional patent application, which was filed on February 5, 2015 as provisional patent application no. 62/112,530 ("the 530 Provisional"). After the 530 Provisional was filed, I formed the new company along with Mr. Hatle and another partner, Mr. Rocky Smith, on February 25, 2015. The new company, Clean Metal Technologies, LLC ("CMT"), was formed as a Louisiana limited liability company.

7. In forming and during the operation of CMT, Mr. Hatle agreed to assign his rights in any intellectual property related to the business to CMT. This included all inventions conceived by Mr. Hatle beginning on January 1, 2015 until one year after his services to CMT were concluded, and

specifically included without limitation the invention(s) disclosed in the 530 Provisional, as well as in a subsequent provisional application no. 62/179,665 ("the 665 Provisional"), filed on May 15, 2015. I executed these assignments as an agent for CMT in Louisiana. I understand that Mr. Hatle executed the assignment of the 530 Provisional in Louisiana, and the assignment of the 665 Provisional in Texas.

8. I owned a controlling interest in CMT which consisted of 51 Class A Units and 69 Class B Units. Mr. Hatle had a minority interest which consisted of 49 Class A Unites and 86 Class B Units. Mr. Hatle was retained as President pursuant to an employment agreement with CMT and agreed to devote his full-time services to CMT. Mr. Hatle's employment agreement also contained provisions prohibiting him from disclosing CMT's confidential information and from competing with CMT for a period of two years after his termination. As part of his employment, he was provided a company vehicle, cell phone, computer, reimbursements for travel, business and entertainment expenses, and an $85,000 per year annual salary. I loaned all of the money used to provide these items to CMT, as well as other money for CMT's insurance, rent, secretarial salary, and other start up expenses and assets.

9. In late August of 2015, I learned that another company, The Tagos Group LLC ("Tagos"), claimed that Mr. Hatle owed it duties of confidentiality and non-competition, pursuant to an agreement or agreements he had signed on July 29, 2013 with his prior employer Corrline International, and apparently acquired by Tagos. Mr. Hatle denied that he had any such obligations, but I was later provided the relevant documents from Tagos's attorney. Mr. Hatle then admitted that he had indeed signed them, although he maintained that they were signed under duress. Due to threatened legal action against CMT and myself as a result of Mr. Hatle's alleged conduct, I loaned money to CMT to defend against these allegations. On behalf of CMT, I engaged attorneys with the Jones Walker law firm in Baton Rouge, Louisiana, to defend CMT's interests.

10. In March 2016, I received e-mails forwarded by a representative of a company called SDS Bionic. CMT had been in discussions to grant a license agreement of its intellectual property to

SDS Bionic. However, the e-mails forwarded by SDS Bionic indicated that Mr. Hatle, without the knowledge of myself or Mr. Smith, the other members of CMT, had represented to SDS Bionic that he was the majority shareholder in CMT and had full rights to negotiate with regard to the sale of CMT's intellectual property. This was not true. The e-mails further indicated that Mr. Hatle had disclosed, without authorization, CMT's confidential information related to its intellectual property and had even requested SDS Bionic begin manufacturing products utilizing that intellectual property. They further indicated that Mr. Hatle had attended two trade shows on behalf of SDS Bionic as its Chief Technical Officer, and was promoting SDS Bionic's product called "Nano Clean Pro," which I understood was a product employing CMT's intellectual property. Further, these e-mails indicated that Mr. Hatle, along with a Mr. Clifford Wright who was acting on Mr. Hatle's behalf, had indicated to SDS Bionic that it was not to have any contact with anyone at CMT other than Mr. Hatle, so that Mr. Hatle could purchase control of CMT. All of these activities were in violation of Mr. Hatle's employment agreement and duties owed to CMT.

11. After receiving these e-mails, I advised Mr. Wright via a letter sent on March 24, 2016, on behalf of CMT, that the secret side discussions between Mr. Hatle and SDS Bionic undermined the ongoing discussions between SDS Bionic and CMT regarding the exclusive license, and that those side discussions had not been authorized by CMT and should be immediately discontinued.

12. In view of Mr. Hatle's multiple breaches of his agreement and duties owed to CMT, CMT terminated Mr. Hatle's employment contract for cause on April 5, 2016. The very next day, on April 06, 2016, I received a letter from Cleve Glenn, who explained that he was an attorney for Mr. Hatle. Mr. Glenn threatened legal action on behalf of Mr. Hatle due to his termination from CMT. I replied via e-mail to Mr. Glenn that I would respond to his letter. On April 8, 2016, my attorney (Sid Sundbery of Duval, Funderburk, Sundbery, Richard & Watkins, Houma, Louisiana) replied to Mr. Glenn. I did not ever deal directly with Mr. Glenn, except for the initial response after receiving his

letter.

13.     On April 21, 2016 Mr. Glenn sent a letter of intent to Mr. Sundbery, proposing as a resolution of Mr. Hatle's issues that Mr. Hatle buy my membership interest in CMT. At no time did I ever negotiate directly with Mr. Glenn or Mr. Hatle regarding the terms of the sale of my membership interest in CMT. At no time did I ever solicit Mr. Hatle or Mr. Glenn for the purchase of my interest in CMT. At no time did I ever enter Texas to discuss the sale of my interests in CMT with Mr. Hatle, Mr. Glenn, or anyone else.

14.     On May 6, 2016, after further negotiations between Mr. Glenn and Mr. Sundbery, Mr. Glenn sent an execution copy of the letter to Mr. Sundbery containing the basic intended terms for the purchase of my membership interest. This letter was subsequently executed by Mr. Hatle and myself. I signed the letter of intent in Louisiana. A true and correct copy of this letter of intent is attached hereto as Exhibit 1.

15.     In August of 2016, the sale of my membership interest in CMT was finalized via execution of an agreement called the Membership Interets Purchase Agreement ("MIPA"). A true and correct copy of the MIPA, including ancillary documents, is attached hereto as Exhibit 2. As part of the MIPA, I also entered into a Noncompetition and Nonsolicitation Agreement with CMT whereby I agreed I would not compete with CMT anywhere in the State of Texas for two years. I executed the MIPA in Louisiana.

16.     During the negotiation of the MIPA, I had no meetings in Texas on the topic. My only involvement in its negotiation was communicating through my attorney Mr. Sundbery, whom I conferred with via telephone and e-mail, as well as in person.

17.     I understand that the MIPA states that for any lawsuit between the parties related solely to the MIPA or its ancillary documents, that jurisdiction and venue lie exclusively in the 32nd Judicial District Court, Terrebonne Parish, Louisiana, and that the agreement is governed exclusively by

Louisiana law. Further, I understand that the MIPA's ancillary agreements (the Deferred Purchase Price Consideration Note, the Deferred Loan Repayment Note, Security Agreement, Exclusive License Agreement, and my Noncompetition and Nonsolicitation Agreement) all state that they are governed by Louisiana law. All of these agreements, save one, further provide that venue and jurisdiction for any proceedings related in any way to the agreement will be in Terrebonne Parish, Louisiana. The single exception is the Exclusive License Agreement, which I understand does not specify a venue or jurisdiction.

18. Pursuant to the MIPA, Mr. Hatle was obligated to make a series of payments to me over time. However, only three payments were made, and these payments were of amounts far less than was specified by the MIPA. Accordingly, pursuant to the MIPA, I sued Mr. Hatle, CMT, and another party to the MIPA (i.e., MicroClean Metals, LLC) in the 32nd Judicial District Court of Terrebonne Parish, Louisiana on November 12, 2019.

19. On December 19, 2019, I was served with a "Plaintiff's Original Petition" filed by Hatle in the 333rd Judicial District Court, Harris County, Texas, in proceedings entitled "Loren L. Hatle v. Clifford Wright, Jr., Berkeley Research Group, LLC, Cleve J. Glenn, Seyfarth Shaw, LLP, MicroClean Metals, LLC and Randy P. LeBoeuf", bearing cause number 2019-87343 (hereinafter the "Texas Lawsuit"). I then retained counsel to file a Special Appearance on my behalf pursuant to Rule 120(a) and to dismiss Hatle's Texas Lawsuit. A true and correct copy of the Defendant Randy P. LeBoeuf's Special Appearance filed on my behalf in the Texas Lawsuit is attached hereto as Exhibit "3". The facts and allegations set forth in Exhibit "3" are true and correct and I am competent to testify to the matters stated therein.

20. I never told Hatle that I knew he could not pay for his membership interest in CMT.

21. At no time prior to my receipt of service of Plaintiff's Original Petition filed by Hatle in the Texas Lawsuit did Hatle ever tell or inform me that he was fraudulently induced by anyone or

6

unknowingly agreed to the forum selection provisions that were contained in MIPA or its ancillary documents or that his execution of the MIPA or ancillary documents were procured by fraud or coercion.

Further, affiant sayeth not.

_____
RANDY P. LEBOEUF

SUBSCRIBED AND SWORN TO BEFORE ME, THE UNDERSIGNED NOTARY PUBLIC, ON THE 20TH DAY OF FEBRUARY 2020, BY RANDY P. LEBOEUF.

_____
NOTARY PUBLIC
(DARRYL T. LANDWEHR #17677)
COMMISSION EXPIRES AT DEATH

7